UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

KE'AIRAH PARKER,

                Plaintiff,

    -against-

THE UTICA CENTER FOR DEVELOPMENT,
INC., and VINCENT SCALISE, *Individually,*

                Defendants.

----------------------------------------------------------X

Case No.:   5:21−cv−00770 (FJS/TWD)

<u>COMPLAINT</u>

PLAINTIFF DEMANDS A TRIAL
BY JURY

       Plaintiff, KE'AIRAH PARKER, (hereinafter "Plaintiff"), by Plaintiff's attorneys, PHILLIPS & ASSOCIATES, ATTORNEYS AT LAW, PLLC, hereby complains of the Defendants, upon information and belief, as follows:

## Nature of the Case

1.    Plaintiff complains pursuant to 42 U.S.C. § 1981 (hereinafter "Section 1981"), and the New York State Human Rights Law, New York State Executive Law § 296, *et seq.* (hereinafter "NYSHRL"). Plaintiff seeks damages to redress the injuries Plaintiff has suffered as a result of being subjected to a hostile work environment and being discriminated and retaliated against by her employer solely due to her race (Black) and her complaints of discrimination.

## Jurisdiction and Venue

2.    Jurisdiction of this Court is proper under 42 U.S.C. § 1981 and 28 U.S.C. §§ 1331 and 1343 as it arises under the laws of the United States and is an action to recover damages or to secure an equitable or other relief under an Act of Congress providing for the protection of civil rights.

3.      The Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this district in that a substantial part of the events or omissions giving rise to the claim occurred within the Northern District of the State of New York. 28 U.S.C. § 1391(b).

**Parties**

5.      At all times material, Plaintiff is and was a resident of Madison County, State of New York.

6.      Plaintiff is Black.

7.      At all times material, Defendant THE UTICA CENTER FOR DEVELOPMENT, INC. (hereinafter "UCD") was and is a domestic not-for-profit corporation organized under the laws of the State of New York with its principal place of business at 726 Washington Street, Utica, New York 13501.

8.      At all times material, Defendant UCD is a Veteran outreach organization that owns and maintains multiple locations throughout New York State, including the UCD location located at 726 Washington Street, Utica, New York 13502 (hereinafter "the Location"), where the discriminatory conduct alleged herein took place.

9.      At all times material, Defendant UCD was Plaintiff's employer under the NYSHRL.

10.     At all times material, Defendant VINCENT SCALISE (hereinafter "SCALISE") is and was the founder of UCD holding the position of Founder/Executive Director.

11.     At all times material, Defendant SCALISE was Plaintiff's supervisor and had supervisory authority over Plaintiff.

2

12.     At all times material, Defendant SCALISE had the power to hire, fire and/or directly affect the terms and conditions of Plaintiff's employment.  Defendant SCALISE had the power to direct Plaintiff's daily work activities.

13.     At all times material, Plaintiff was an employee of Defendant UCD and Defendant SCALISE.

14.     Defendant UCD and Defendant SCALISE are sometimes collectively referred to as "Defendants."

15.     At all times material, Defendants were employers under Section 1981 and the NYSHRL.

16.     At all times material, all parties mentioned herein worked and/or continue to be employed at the Location.

## Material Facts

17.     On or about August 26, 2019, Plaintiff began working full time for Defendant UCD at the Location as a case manager, earning approximately $26,000 per year.

18.     Plaintiff was qualified for her position and performed her duties well.

19.     In or around October 2019, shortly after Plaintiff's employment began, Defendant SCALISE began discriminating against Plaintiff.

20.     In or around October 2019, Plaintiff was in a staff meeting with her other co-workers at the Location.  At the time, Plaintiff had nail extensions on her fingers. Defendant SCALISE pointed out Plaintiff's long nails and stated in sum and substance, "how can you type with those things on your fingers?"  Defendant SCALISE went into Plaintiff's office later that day and made another comment stating "you people always get nails like that, I'll never understand it. How can you do anything with those things?" Plaintiff felt shocked and embarrassed at Defendant SCALISE's comments.

3

21.    Plaintiff immediately understood Defendant SCALISE's reference to the way "you people" style nails to constitute a racist generalization of Black people.

22.    In or around October 2019, Plaintiff arrived at work with a head wrap on.  Defendant SCALISE entered Plaintiff's office and stated in sum and substance, "what do you got on a durag? You a gang banger now? You selling drugs in here?"  Plaintiff was offended and humiliated as Defendant SCALISE never made those remarks towards Plaintiff's non-Black co-workers.

23.    It was clear to Plaintiff that Defendant SCALISE was again stereotyping Blacks by commenting that Plaintiff was part of a gang and selling drugs.

24.    In or around January 2020, Plaintiff's supervisor was terminated.  As a result, Plaintiff took on additional responsibilities at Defendant UCD.

25.    Upon information and belief, the previous employee who held the above-mentioned position was Caucasian and received a higher salary than Plaintiff did in the same position.

26.    Upon information and belief, throughout Plaintiff's employment at Defendant UCD, Defendant SCALISE assigned Plaintiff more work and more projects than Plaintiff's non-Black co-workers, all while being paid the same or less than them.

27.    In or around late May 2020, Defendant SCALISE expressed his hate for the "Black Lives Matter" movement.  Defendant SCALISE approached Plaintiff and encouraged her not to support the "Black Lives Matter" movement, by stating, in sum and substance, "the animals protesting over these deaths are doing more to hurt their communities than they are changing anything."  Defendant SCALISE went on to berate Plaintiff and ask "you're not one of them, are you? One of them that supports the BLM."  Plaintiff was shocked and insulted by Defendant SCALISE's comments.

28.     It was humiliating for Plaintiff to have to answer to an employer like Defendant SCALISE who was extremely vocal in disparaging the Black Lives Matter movement.

29.     In or around early June 2020, during the wake of the "Black Lives Matter" movement, Defendant SCALISE stated, in sum and substance, "this BLM bullshit is like the #metoo movement bullshit." While mentioning the "Black Lives Matter" movement, Defendant SCALISE stated "oh, you know how they are when they get mad." Plaintiff was offended and disgusted.

30.     In or around June 2020, Defendant SCALISE created a petition titled "Keep our Christopher Columbus Statue," and posted said petition on Defendant UCD's Facebook page.

31.     On or about June 25, 2020, shortly after publicizing the petition and posting corresponding offensive comments on Defendant UCD's Facebook page, Defendant SCALISE called Plaintiff and stated, in sum and substance, "I need you to do something for me. I need you to tell me if I'm racist. Because I don't think I am but apparently a bunch of people online do." Plaintiff was unsure how to respond as Defendant SCALISE's tone was demanding and strong, and Plaintiff believed that if she spoke out against Defendant SCALISE, it would anger him. Plaintiff was insulted and believed that Defendant SCALISE came to her solely because she was Black.

32.     That same day, Defendant SCALISE called Plaintiff again and stated that he was upset that everyone was calling him racist and stated that Plaintiff had to "talk him down." Defendant SCALISE considered dismantling Defendant UCD and explained to Plaintiff that if he did not have a job, no one else did either. Ultimately, Defendant SCALISE forced Plaintiff to draft a statement in response to the comments that he was facing calling him racist.

5

Defendant SCALISE stated, in sum and substance, "if you refuse to make the statement, you will no longer have a job." Plaintiff felt as if she had no choice but to create the statement on behalf of Defendant SCALISE. Later that day, Defendant SCALISE altered what was posted on Defendant UCD's Facebook page, taking responsibility for the aforementioned post.

33.    Shortly thereafter, Defendant SCALISE ranted, in sum and substance, "I should not have to bite my tongue with my beliefs because it is my God given right." Defendant SCALISE would also state "I would put a bullet in any one of those protestors online." Plaintiff was terrified.

34.    In or around late June 2020, Plaintiff approached Defendant UCD's Human Resources Administrator, Christina Wasielewski, and co-worker, Blake Arcuri. Plaintiff expressed her concerns regarding Defendant SCALISE's conduct on social media, including posting a variety of racially insensitive and racist posts.

35.    Mr. Arcuri responded to Plaintiff's concerns and stated, in sum and substance, "I feel bad and I wish there was more I could do. [Defendant] SCALISE owes everyone an apology."

36.    Plaintiff told Ms. Wasielewski and Mr. Arcuri that she felt unsafe with the threats that were made as Defendant SCALISE was creating these posts on a company page. Plaintiff explained that she felt uncomfortable at Defendant UCD as she was the only Black employee at Defendant UCD.

37.    Plaintiff asked Ms. Wasielewski if there was anything that can be done from Human Resources to which Ms. Wasielewski stated that she was working from home and on maternity leave so there is not much that she could do. Ms. Wasielewski explained that if

she were in-person, she would have more leverage, but she did not want to address these issues at this time.

38. Upon information and belief, Plaintiff's concerns were not brought to Defendant SCALISE's attention.

39. Shortly after, Defendant SCALISE began making posts on his personal Facebook page, as well as Defendant UCD's Facebook page, that were racially offensive and seen by Plaintiff and other employees of Defendants. (*See e.g.* Exhibit A)

40. In or around July 2020, Plaintiff was promoted to Program Manager of Client Wellness and received a pay raise to approximately $33,000 per year.

41. In or around August 2020, Plaintiff came to work with her hair in braids. Defendant SCALISE's mother, Anna Scalise, who was also employed by Defendant UCD, approached Plaintiff and stated in sum and substance "what are those things on your head? I don't like how they look, it looks better and more professional straight." Plaintiff was hurt and insulted by Ms. Scalise's insensitive comments. Plaintiff believed that Ms. Scalise's comments about her hair stemmed from a problem she had with Black hairstyles.

42. On or about August 24, 2020, Plaintiff's hair was still in braids. Defendant SCALISE approached Plaintiff and stated in sum and substance, "you really think that hair is appropriate for work?" Defendant SCALISE again expressed a problem with Black hairstyles. Plaintiff was shocked and offended.

43. On or about August 25, 2020, Plaintiff texted Ms. Wasielewski that she felt uncomfortable while working at Defendant UCD, and because of Defendant SCALISE's racially insensitive behavior, comments, and social media posts. Ms. Wasielewski responded "That's really obnoxious and out of line. What is actually wrong with him? I don't blame

you, I'd feel the same." Plaintiff explained that she felt weird being around Defendant SCALISE and wanted to keep it short with him. Ms. Wasielewski responded "Yeah, he has zero tact when it comes to things like that. Anything really. Not that this equates to your situation at all but his comments everyday about me being pregnant and how my husband made him hire a pregnant lady… even now he makes comments like 'you're not pregnant again are you?' Like who cares if I was?? Is that even your business?? So I def feel you."

44.     In or around September 2020, Plaintiff and Defendant SCALISE had meetings to discuss projects that Plaintiff was working on. In one particular meeting, Plaintiff told Defendant SCALISE that in response to Defendant SCALISE's Facebook posts, the Location was receiving threats, specifically that someone was going to "shoot up the place," and also threatening to withdraw future donations.  Plaintiff also explained that she was concerned for her daughter, who had to come to the Location at times as in-person schools were suspended due to the COVID-19 pandemic. In response to Plaintiff's concerns, Defendant SCALISE took out a firearm, placed it on the desk in front of Plaintiff and stated "I'm not worried about anyone coming here, it'll be fine." Plaintiff felt intimidated and terrified.

45.     As a result of the aforementioned meeting, Plaintiff expressed her concerns to her assistant, stating that she was worried about bringing her daughter to the Location as Defendant SCALISE refused to take her concerns seriously.  Plaintiff was anxious and had difficulty sleeping as she was fearful for what was to come.

46.     In or around October 2020, Plaintiff organized and attended a "Basketball Showdown" event at Defendant UCD. Shortly after the event, Defendant SCALISE approached Plaintiff and stated, in sum and substance, "by the way, I wanted to mention that a board member saw you at the event and your blouse was low-cut."  Plaintiff was offended and frustrated

8

because her attire was appropriate.  Plaintiff believed that she was being singled-out as, non-Black female board members frequently came to work in inappropriate attire, but upon information and belief, it was not a problem for Defendants.

47.     Upon information and belief, Plaintiff was the only individual who Defendant SCALISE approached regarding inappropriate attire, and she believed she was being singled out due to her race.

48.     On or about November 18, 2020, a volunteer for Defendant UCD spoke with Plaintiff and explained that she believed that her voice was being suppressed because she was an African American.  Specifically, the volunteer stated that a Caucasian male employee of Defendant UCD cornered the volunteer and stated in sum and substance, that the volunteer was replaceable, and she should leave Defendant UCD.  The volunteer told Plaintiff that managers at Defendant UCD were aware of the situation, but nothing was done.  Plaintiff informed Ms. Wasielewski of the volunteer's concerns, whereafter Ms. Wasielewski told Plaintiff to "stay in her place."

49.     In or around the end of November 2020, Plaintiff had to undergo surgery for removal of her gallbladder. Plaintiff was out of work from the end of November 2020 through January 6, 2021.

50.     On or about January 7, 2021, Defendant SCALISE went to Washington, D.C. as part of his duties within the New York Division of the National Guard.

51.     On or about January 14, 2021, Plaintiff approached Ms. Wasielewski to ask what policies were in place at Defendant UCD for racial discrimination. Ms. Wasielewski read the employee handbook and informed Plaintiff of the "general policies regarding discrimination and sexual harassment."

52. On or about February 10, 2021, Defendant SCALISE, Ms. Wasielewski and Mr. Arcuri approached Plaintiff and urged Plaintiff to take a less-desirable position with more work and no increase in salary. Plaintiff asked Defendant SCALISE if they could speak about the position rather than her being forced into it, to which Defendant SCALISE stated that she will have to wait until he returns from Washington, D.C. As a result of this request, Defendant SCALISE refused to respond to nearly any of Plaintiff's e-mails, calls and/or text messages, and, if he did respond, he was very short with his responses.

53. On or about March 15, 2021, Plaintiff's daughter was feeling ill. Plaintiff contacted Ms. Wasielewski and requested to work from home so that she would be in close proximity to her sick daughter. Plaintiff had also provided a doctor's note to Ms. Wasielewski from her daughter's doctor. Plaintiff has worked from home in the past, so this was not an unusual request. In response to Plaintiff's request, Ms. Wasielewski stated that Plaintiff would need to use sick time or comp time, and that the doctor's note would not be applicable to her as the note is relating to Plaintiff's daughter, not Plaintiff herself. Plaintiff was frustrated as her non-Black co-workers, including Ms. Wasielewski, were able to work from home in the past without needing to take sick or comp time.

54. Upon information and belief, in or around the end of March 2021, Ms. Wasielewski worked from home as her child was ill, and she was not required to take sick or comp time.

55. On or about March 22, 2021, Ms. Scalise informed Plaintiff's co-worker "Tracey" not to copy Plaintiff on any e-mails. Plaintiff was frustrated and confused as Plaintiff had been "Tracey's" supervisor for approximately one (1) year and, as manager, needed to be abreast of certain work being done at Defendant UCD.

56.    On or about March 23, 2021, Plaintiff worked at Defendant UCD's Catskills location, which she did with some frequently.

57.    On or about March 26, 2021, Plaintiff had a scheduled phone call with Defendant SCALISE to address projects that Plaintiff was handling, as well as to inform Defendant SCALISE of the discrimination that she was facing at Defendant UCD.  As Plaintiff began informing Defendant SCALISE of the discrimination she was facing at Defendant UCD, Defendant SCALISE became agitated and believed that he was being unfairly accused. Defendant SCALISE stated that he was uncomfortable speaking to Plaintiff without a third-party being present.  Plaintiff and Defendant SCALISE scheduled a meeting that following Monday to further discuss Plaintiff's complaints. Defendant SCALISE stated that his attorney would be present during the meeting.

58.    On or about March 29, 2021, a volunteer at Defendant UCD approached Plaintiff and made her aware that he was discriminated against at Defendant UCD for being African American and had been called a "nigger." The volunteer informed Plaintiff that he went to other managers at Defendant UCD, and no action was taken.

59.    On or about March 29, 2021, Defendant SCALISE e-mailed Plaintiff and cancelled their scheduled meeting. Defendant SCALISE explained that he did so because Plaintiff accused him of wrongdoing and provided Plaintiff with three options: "[Plaintiff] can submit to me in writing your complaints/issues and concerns, I am willing to review them and send a written response back. You can file for a formal grievance that will go to the board of directors. Or we can part ways." Defendant SCALISE also informed Plaintiff that Mr. Arcuri was her direct supervisor.  Plaintiff was confused as Plaintiff was never informed that Mr. Arcuri was her supervisor.

60.     Plaintiff responded to Defendant SCALISE's e-mail and asked Defendant SCALISE when Mr. Arcuri became her supervisor, as she always believed that Defendant SCALISE himself was her direct supervisor. In response, Defendant SCALISE stated "I[t] appears that we need to part ways consider this your formal notice of termination. Please turn in your computer and keys to the business office."

61.     Shortly after receiving the termination e-mail from Defendant SCALISE, Mr. Arcuri and Ms. Wasielewski entered Plaintiff's office informing her that she needed to gather her items and exit the premises within one hour.  Plaintiff felt ambushed and had no opportunity to gather her items.

62.     On or about March 30, 2021, Plaintiff contacted Defendant SCALISE and Ms. Wasielewski in an attempt to gather the remainder of her belongings which remain at Defendant UCD. Instead of assisting Plaintiff in her request, Ms. Wasielewski responded "[a]t this time any and all requests must be made through our attorney's office, and moving forward we will only be communicating with you via our attorney."  Plaintiff's personal items are still in the possession of Defendant UCD.

63.     Upon information and belief, individuals in the past who were terminated or voluntarily left Defendant UCD were afforded the courtesy of using Defendant UCD's box truck to remove their items from the Location.  Plaintiff was not afforded such an opportunity.

64.     Plaintiff attempted to contact Defendants' "attorneys" directly multiple times but never received a response.

65.     The above are just some of the comments and conduct which contributed to the race-based hostile work environment that Plaintiff experienced on a regular basis while employed by Defendants.

66.    Defendant SCALISE literally referred to Black Lives Matter protestors as animals and Plaintiff was indeed made to feel less than human by him.  Defendants did not even have the decency to allow Plaintiff to collect her personal belongings from the Location when she was terminated and she was ordered to leave as if she was a criminal.

67.    Plaintiff was repulsed, offended, disturbed, humiliated, victimized, and disgusted by this blatantly unlawful racial harassment, discrimination, and hostile work environment.

68.    Defendants created a hostile work environment, which unreasonably interfered with Plaintiff's ability to perform Plaintiff's job.

69.    Defendants' actions and conduct were intentional and intended to harm Plaintiff.

70.    Defendants discriminated against Plaintiff solely due to Plaintiff's race (Black) and her objections to the discriminatory and retaliatory actions taken against Plaintiff.

71.    But for Plaintiff's race (Black), Plaintiff would not have endured the hostile work environment to which she was subjected by Defendants.

72.    But for Plaintiff's race (Black) and her complaints of race discrimination, Plaintiff's employment would not have been terminated by Defendants.

73.    Defendants unlawfully discriminated against, retaliated against, humiliated, degraded and belittled Plaintiff. As a result, Plaintiff suffers loss of rights, emotional distress and loss of income.

74.    Plaintiff was subjected to such a discriminatory, retaliatory, hostile and abusive work environment that no reasonable person in Plaintiff's shoes could or should be expected to endure.

75.     As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of employment, income, the loss of a salary, loss of bonus, loss of benefits, other compensation which such employment entails, special damages, and great inconvenience.

76.     As a result of the acts and conduct complained of herein, Plaintiff has suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.   Plaintiff has further experienced severe emotional and physical distressed.

77.     Defendants acted maliciously, willfully, outrageously, and with full knowledge of the law.

78.     As such, Plaintiff demands punitive damages against all the Defendants, jointly and severally.

**First Cause of Action for Discrimination
Under 42 U.S.C. § 1981 (As Amended)
<u>(Against All Defendants)</u>**

79.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

80.     42 U.S.C. § 1981 provides, in pertinent part:

> (a) Statement of Equal Rights.  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

81.     Defendant UCD and Defendant SCALISE engaged in unlawful employment practices prohibited by 42 U.S.C. § 1981, by discriminating against Plaintiff because of her race (Black).

82.     Defendant UCD and Defendant SCALISE violated the sections cited herein as set forth.

83.    Plaintiff is entitled to the maximum amount allowed under this statute.

**Second Cause of Action for Retaliation
Under 42 U.S.C. § 1981 (As Amended)
(Against All Defendants)**

84.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

85.    By the acts and practices described above, Defendant retaliated against Plaintiff for her

opposition to unlawful discrimination under 42 U.S.C. § 1981.

86.    Defendants acted with malice and/or reckless indifference to Plaintiff's statutorily

protected rights.

87.    Defendant UCD and Defendant SCALISE violated the sections cited herein as set forth.

88.    Plaintiff is entitled to the maximum amount allowed under this statute.

**Third Cause of Action for Discrimination
Under the New York State Executive Law
(Against All Defendants)**

89.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

90.    New York State Executive Law § 296(1) provides that:

It shall be an unlawful discriminatory practice:

(a) For an employer or licensing agency, because of an individual's
age, **race**, creed, color, national origin, sexual orientation,
military status, sex, disability, predisposing genetic
characteristics, familial status, marital status, or domestic
violence victim status, to refuse to hire or employ or to bar or to
discharge from employment such individual or to discriminate
against such individual in compensation or in terms, conditions
or privileges of employment.

91.    Defendants engaged in an unlawful discriminatory practice by creating and maintaining a hostile work environment and otherwise discriminating against Plaintiff because of her race (Black).

92.    Defendant UCD and Defendant SCALISE violated the sections cited herein as set forth.

93.    Plaintiff is entitled to the maximum amount allowed under this statute.

**Fourth Cause of Action for Discrimination**
**Under the New York State Executive Law**
**(Not Against Corporate Defendant)**

94.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

95.    New York State Executive Law § 296(6) provides in pertinent part, that it shall be an unlawful discriminatory practice "…for any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

96.    Defendant SCALISE violated the statute cited herein as set forth.

97.    Plaintiff is entitled to the maximum amount allowed under this statute.

**Fifth Cause of Action for Retaliation**
**Under the New York State Executive Law**
**(Against All Defendants)**

98.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

99.    New York State Executive Law § 296(1) provides that:

It shall be an unlawful discriminatory practice:

(e)  For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

100.    Defendant UCD and Defendant SCALISE violated the sections cited herein as set forth.

101.    Plaintiff is entitled to the maximum amount allowed under this statute.

**Jury Demand**

102.    Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.  Declaring that Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. § 1981, as amended; and the New York State Human Rights Law, New York State Executive Law § 296, *et. seq.*, in that Defendants discriminated against Plaintiff and created a hostile work environment based on Plaintiff's race (Black), retaliated against Plaintiff due to her complaints of discrimination, and unlawfully terminated Plaintiff;

B.  Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful harassment, discrimination, retaliation, and conduct and to otherwise make Plaintiff whole for any losses suffered because of such unlawful employment practices;

C.  Awarding Plaintiff compensatory damages for mental and emotional injury, distress, pain, suffering and injury to Plaintiff's reputation in an amount to be proven;

D.  Awarding Plaintiff damages for loss of income, the loss of a salary, bonus, benefits, and other compensation which such employment entails;

E.  Awarding Plaintiff punitive damages;

F.  Awarding Plaintiff liquidated damages;

G.  Awarding Plaintiff prejudgment interest;

H.  Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of this action; and

I.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and

proper to remedy Defendants' unlawful employment practices.

Dated:  New York, New York
       July 6, 2021

                                      **PHILLIPS & ASSOCIATES,**
                                      ATTORNEYS AT LAW, PLLC

By:  _____
                      Steven Fingerhut
                      *Attorneys for Plaintiff*
                      45 Broadway, Suite 430
                      New York, New York 10006
                      (212) 248-7431
                      sfingerhut@tpglaws.com

18

# EXHIBIT A

1:32

 

 Vincent Scalise
3h · 🌐

 Rob Hager
Aug 10 · 🌐



AMERICA ALREADY PAID THE WAGES OF SLAVERY IN BLOOD

580,000 WHITE MEN DIED IN THE STRUGGLE. THAT'S ENOUGH, THE DEBT OF SLAVERY HAS BEEN PAID.

MOVE ON, THE ISSUE OF SLAVERY WAS CONCLUDED IN 1865.

imgflip.com

  4

1 Share

